OPINION
{¶ 1} Defendant-Appellant Toie L. Mitchell appeals from his conviction and sentence for Robbery, following a jury trial. Mitchell contends that that his conviction is against the manifest weight of the evidence, because the State failed to prove the use-of-force element of Robbery beyond a reasonable doubt.
 {¶ 2} Based on the evidence in the record, we do not conclude that the jury lost its way and created a manifest miscarriage of justice. To the contrary, we conclude that the weight of the evidence supports the jury's decision that Mitchell threatened the immediate use of force against Lisa Parson while attempting or committing a theft offense or in fleeing immediately after the attempt or offense. We conclude that Mitchell's conviction is not against the manifest weight of the evidence.
 {¶ 3} Accordingly, the judgment of the trial court is affirmed.
 I {¶ 4} One evening in late June, 2001, Lisa Parson was sitting on her front porch when Toie Mitchell approached her. Mitchell asked Parson to call her husband. When Parson reached for the phone, Mitchell allegedly told her to go inside her house. When Parson went inside her house, Mitchell allegedly followed her in and then demanded money from her at gunpoint. When Parson indicated that she did not have any money, Mitchell allegedly asked her if the purse on the table was hers. When Parson indicated it was, Mitchell allegedly demanded her to get her money out of her purse. Parson gave Mitchell $50 out of her purse. While still pointing the gun at Parson, Mitchell then allegedly demanded Parson to give him the jewelry she was wearing. Parson gave Mitchell two gold chains, bracelets, and some rings that she was wearing. Mitchell allegedly told Parson to tell her husband that "Skane came by" and told her not to call the police, because someone was watching her house. Mitchell allegedly left Parson's house out the back door and went down the hill behind Parson's house. Parson eventually called the police. A couple of days later, Parson identified Mitchell from a photo-spread Detective C.W. Ritchey showed her.
 {¶ 5} Mitchell was subsequently arrested and indicted on one count of Aggravated Robbery, in violation of R.C. 2913.01(K) and R.C. 2911.01(A)(1), with a firearm specification. A jury found Mitchell guilty of Robbery, a lesser-included offense of Aggravated Robbery. Mitchell was sentenced to be imprisoned for a term of one year.
 {¶ 6} Mitchell appealed from his conviction and sentence, and his appointed appellate counsel filed an Anders brief asserting that he could not find genuine appealable issues to pursue in the appeal. We concluded that an appealable issue existed regarding whether the judgment is against the manifest weight of the evidence with respect to the use-of-force element of Robbery.State v. Mitchell, Montgomery App. No. 19216.
 {¶ 7} From his conviction and sentence, Mitchell appeals.
 II {¶ 8} Mitchell's sole assignment of error is as follows:
 {¶ 9} "Appellant's conviction was against the manifest weight of the evidence."
 {¶ 10} Mitchell contends that his conviction for Robbery is against the manifest weight of the evidence, because the State failed to prove the use-of-force element of Robbery beyond a reasonable doubt.
 {¶ 11} When reviewing a weight-of-the-evidence claim, "`[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citation omitted.
 {¶ 12} Mitchell was convicted of Robbery, in violation of R.C. 2911.02(A)(3), which states as follows:
 {¶ 13} "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another."
 {¶ 14} The use-of-force element of Robbery is satisfied "if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed." State v. Davis (1983), 6 Ohio St.3d 91, 94, 6 OBR 131, 451 N.E.2d 772. "The test for force or threat of force is objective and relies on the totality of the circumstances. Statev. Habtemariam (1995), 103 Ohio App.3d 425, 659 N.E.2d 850. R.C.2901.01(A) defines `force or threat of force' as any violence, compulsion, or constraint physically exerted or threatened to be exerted by any means upon a person or thing. This court has further limited this definition of force, however, by ruling that the necessary violence, compulsion, constraint or threat thereof must be of a type that exacts or potentially exacts harm to a person. State v. Furlow (1992), 80 Ohio App.3d 146,608 N.E.2d 1112. Furthermore, the Supreme Court held in State v. Davis
(1983), 6 Ohio St.3d 91, 6 OBR 131, 451 N.E.2d 772, that the threat of violence, compulsion, or constraint need not be direct and explicit; rather, it can be implied from the perpetrator's demeanor and tone of voice." State v. Bush (1997),119 Ohio App.3d 146, 150, 694 N.E.2d 984.
 {¶ 15} During Mitchell's jury trial, Lisa Parson testified as follows:
 {¶ 16} "A. I reached for the phone and that's when he told me just to getup and go in the house.
 {¶ 17} "Q. And did you do what he said?
 {¶ 18} "A. Yes.
 {¶ 19} "Q. When you went into the house, did he go with you?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. What happened inside the house?
 {¶ 22} "A. He asked me where was the money?
 {¶ 23} "Q. At this point in time, did this individual have anything in his hands?
 {¶ 24} "A. Yes.
 {¶ 25} "Q. And what was in his hands?
 {¶ 26} "A. A gun.
 {¶ 27} "Q. Did you see where this gun came from?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. Where'd it come from?
 {¶ 30} "A. Out the front of his pants.
 {¶ 31} "Q. How big was this gun?
 {¶ 32} "A. It was a square shape like this — [Indicating] — with a little bitty point — a little bitty barrel on the front.
 {¶ 33} "Q. Could you tell whether the gun was loaded?
 {¶ 34} "A. No, I can't tell. No.
 {¶ 35} "Q. Did you believe it to be loaded?
 {¶ 36} "A. Yes.
 {¶ 37} "Q. How was he holding the gun?
 {¶ 38} "A. He was pointin' it at me like this — [Indicating].
 {¶ 39} "Q. And was it at his side or at his chest area?
 {¶ 40} "A. Like right in here — [Indicating].
 {¶ 41} "Q. And he pointed the gun at you and then he demanded money?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. What did you do?
 {¶ 44} "A. I told him there wasn't no money here.
 {¶ 45} "Q. And did he ask for somethin' else then?
 {¶ 46} "A. He asked me was that my purse on the table. I told him: `Yes.' He told me to get him the money out of my purse.
 {¶ 47} "Q. And did you do that?
 {¶ 48} "A. Yes.
 {¶ 49} "Q. At this point in time when he asked you for the money out of your purse, where was the gun?
 {¶ 50} "A. It was still pointin' at me.
 {¶ 51} "Q. Did you give him money out of your purse?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. How much?
 {¶ 54} "A. I had two twenties and a ten in my purse.
* * *
 {¶ 55} "Q. After you gave him money, what'd he do?
 {¶ 56} "A. He told me to give him the chains off of my neck.
 {¶ 57} "* * *
 {¶ 58} "Q. And did you do that?
 {¶ 59} "A. Yes.
 {¶ 60} "Q. When he asked you to — asked you for those gold — those gold chains, where was this gun?
 {¶ 61} "A. It was still aimin' at me.
 {¶ 62} "Q. You gave him the two chains?
 {¶ 63} "A. Yes.
 {¶ 64} "Q. Did he ask for anything else?
 {¶ 65} "A. Yes. He told me just to give him, uh . . . everything else I had on.
 {¶ 66} "Q. And when he asked you this or told you this . . .
 {¶ 67} "A. Mmm Hmm.
 {¶ 68} "Q. . . . where was the gun?
 {¶ 69} "A. It was still pointin' at me.
 {¶ 70} "Q. And what else did you give him?
 {¶ 71} "A. I started takin' the rings off that I had on and I asked him if I could keep the one ring that, uh . . . my Dad gave me. He told me: `Yes.' He told me but give him everything else that I had.
 {¶ 72} "* * *
 {¶ 73} "Q. When this individual asked for your money and your jewelry, did you give this to him as a gift?
 {¶ 74} "A. No.
 {¶ 75} "Q. Was it a loan?
 {¶ 76} "A. No.
 {¶ 77} "Q. Did you — was there any reason for him to think that this — he had permission to take this . . .
 {¶ 78} "A. No.
 {¶ 79} "Q. . . . these items?
 {¶ 80} "* * *
 {¶ 81} "Q. What was the last piece of item [sic] that you gave him?
 {¶ 82} "A. My bracelets.
 {¶ 83} "* * *
 {¶ 84} "Q. When he asked for your bracelets, where was the weapon; where was the gun?
 {¶ 85} "A. It was still pointin' at me.
 {¶ 86} "Q. After you gave him your bracelets, what did he do?
 {¶ 87} "A. Then he proceeded to go to the back door and he told me to tell Rob that Skane came by. And he told me don't think about callin' the police because someone was watchin' my house."
 {¶ 88} Mitchell contends that Parson's testimony does not establish that he threatened to use any type of force against her, because Parson did not testify that Mitchell threatened to use immediate force against her. We disagree.
 {¶ 89} In Davis, the Ohio Supreme Court concluded that the use-of-force element of Robbery is satisfied where there is "evidence that the offender, while demanding money from a person, uses the particular demeanor of holding one of his hands under his clothing hidden from the victim's view, as if carrying a firearm, although the offender does not verbally threaten harm."Davis, 6 Ohio St.3d at 93. Although Parson did not testify that Mitchell verbally threatened to harm her, she did testify that Mitchell pointed a gun at her, which she believed to be loaded, while demanding money and jewelry from her. It is clear from Parson's testimony that she parted with the money and jewelry unwillingly, because Mitchell had a gun pointed at her. Parson's fear, occasioned by Mitchell's actions in pointing a gun at her, was reasonable, in view of the circumstances, and was sufficient to induce a reasonable person to part with property involuntarily, thereby satisfying the threatened-use-of-force element of Robbery. Consistent with Davis, we conclude that the evidence supports the jury's determination that the use-of-force element of Robbery was proven beyond a reasonable doubt.
 {¶ 90} Mitchell also contends that Parson's testimony is contradicted by the testimony of Jaime Johnson, Parson's neighbor, because Johnson testified that she did not see a gun in Mitchell's possession. However, Johnson did not testify that she actually saw the robbery take place in Parson's home, a few houses up the hill from her home. Johnson testified that she observed Mitchell running down the hill holding his pockets. When asked if she saw a gun in Mitchell's possession, Johnson testified that she "didn't actually see a gun, but you could tell that there was something in his pockets."
 {¶ 91} We conclude that Johnson's testimony is not inconsistent with Parson's testimony. Johnson testified that she did not see a gun in Mitchell's possession when he was running down the hill. Parson testified that Mitchell pointed a gun at her during the robbery in her home, not that he held the gun while running down the hill. In addition to Parson's testimony that Mitchell pulled the gun out of his pants pocket, Johnson also testified that "you could tell that there was something in his pockets," which would support a reasonable inference that it could have been the gun that Mitchell pointed at Parson.
 {¶ 92} In addition, "only once it is patently apparent that the factfinder lost its way will this Court substitute its judgment on matters of credibility." State v. Hufnagel, Montgomery App. No. 15563, 1996 WL 501470, at *6. Based on the record, we do not conclude that the jury lost its way and created a manifest miscarriage of justice. To the contrary, we conclude that the weight of the evidence supports the jury's decision that Mitchell threatened the immediate use of force against Parson while attempting or committing a theft offense or in fleeing immediately thereafter. We conclude that Mitchell's conviction for Robbery is not against the manifest weight of the evidence.
 {¶ 93} Mitchell's sole assignment of error is overruled.
 III {¶ 94} Mitchell's sole assignment of error having been overruled, the judgment of the trial court is affirmed.
Grady and Young, JJ., concur.